UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TOOLING, MANUFACTURING &
TECHNOLOGIES ASSOCIATION,

    Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　　　Case No. 08-cv-11812

HARTFORD FIRE INSURANCE　　　　　　　HONORABLE STEPHEN J. MURPHY, III
COMPANY,

    Defendant,

v.

MARK TYLER; TEAM MARKETING
GROUP, INC. d/b/a TYLER
CONSTRUCTION, INC., TEAM BENEFITS
GROUP, INC.,
ALLIED RISK, INC.; and
MARK TYLER & ASSOCIATES, INC.,

    Third-Party Defendants.
                                /

**OPINION AND ORDER GRANTING DEFENDANT'S
<u>MOTION FOR SUMMARY JUDGMENT</u> (docket no. 37)**

This is an insurance coverage dispute predicated on diversity jurisdiction, 28 U.S.C. § 1332(a). Plaintiff claims the policy it purchased requires Defendant to pay it $300,000 for its loss due to employee theft. Defendant denies liability and has moved for summary judgment. Plaintiff also moved for summary judgment in its response brief. For the reasons below, the Court will grant Defendant's motion, deny Plaintiff's motion, and enter judgment in Defendant's favor.

**FACTS**

1. <u>The Insurance Policy</u>

Defendant Hartford Fire Insurance Company ("Hartford") issued an insurance policy ("Policy") effective September 16, 2003, naming Michigan Tooling Association[1] ("TMTA") as the only insured. Policy (docket no. 37, ex. D, at 1). Subsequently, the following entities were named as additional insureds on the Policy: MTA Salaried Employee Defined Benefits Plan, MTA Money Purchase Pension Plan, MTA Salaried Employee Defined Contribution Plan, MTA Deferred Compensation Plan, MTA Insurance Trust, and MTA Dental Trust. *Id.* at 2. No other entities were added during the life of the Policy.

Among the types of loss covered by the Policy are losses resulting from "employee theft." Coverage for each occurrence of employee theft is capped at $300,000, subject to a $5,000 deductible.[2] *Id.* at 3. Insuring Agreement 1 of the Policy further defines the scope of coverage for "employee theft" and states that Hartford will pay for "loss of or damage to 'money', 'securities' and 'other property' which results directly from 'theft' by an 'employee', whether or not identifiable, while acting alone or in collusion with other persons." *Id.* at 4 (II(A)). There is no dispute as to the meaning of any word or phrase in Insurance Agreement 1, except for the word "directly." The parties also agree that Insuring Agreement 1 is the only agreement applicable in this case.

---

[1] Michigan Tooling Association later changed its name to Tooling, Manufacturing &Technologies Association ("TMTA").

[2] TMTA concedes for purposes of this motion that the instances of employee theft at issue in this case constitute only one such "occurrence," and that TMTA may recover a maximum of $300,000, less its deductible.

The Policy states that Hartford will pay for direct losses, but excludes payment for indirect ones. Specifically, the "Consideration clause" provides:

> In exchange for the payment of premium and subject to the Declarations, Insuring Agreements, Exclusions, General Conditions, Definitions and terms of this Policy, we will pay for loss which you sustain resulting *directly* from acts committed or events occurring at any time and discovered by you during the Policy Period shown in the Declarations or during the period of time provided in General Condition L., EXTENDED PERIOD TO DISCOVER LOSS.

*Id.* at 4 (emphasis added, caps in original).

With respect to indirect losses, the Policy provides:

> V. EXCLUSIONS:
>
> This Policy Does Not Apply To And We Will Not Pay For:
>
> H. Indirect Loss
>
> Loss that is an indirect result of any act or "occurrence" covered by this Policy including but not limited to loss resulting from: 1) your ability to realize income that you would have realized had there been no loss of or damage to "money", "securities" or "other property"....

*Id.* at 6 (V(H)).

2. <u>TMTA and the Agency</u>

Plaintiff TMTA is a trade association whose members are involved primarily in the manufacturing and tooling industries. TMTA Insurance Agency, LLC (the "Agency") is a Michigan limited liability company that brokers insurance policies for TMTA members. TMTA is the Agency's sole member and TMTA's entire revenue derives primarily from the Agency in the form of commissions from insurance companies paid directly to the Agency for brokering policies to TMTA members. The Agency has no employees and its property consists only of the commissions paid to it by insurance companies for sales of policies to TMTA members. TMTA accounts for all of the Agency's income as part of its federal and

3

state filings. Thus, each year, TMTA receives the entire benefit or loss from the Agency's operations. The Agency appears to have been formed by TMTA for the sole purpose of receiving insurance commissions.[3]

3. <u>Employee Theft</u>

TMTA hired Mark Tyler as the Agency's General Manager for the purpose of brokering life, health, disability, and accident insurance for TMTA members. Tyler was paid a salary and an annual bonus by TMTA. All commissions paid by insurance companies for policies brokered by Tyler were to be paid to the Agency, not to Tyler or TMTA.[4] Tyler resigned effective February 28, 2007. After he left, TMTA discovered he had diverted insurance commissions to himself through entities he owned exclusively.

TMTA and the Agency sued Tyler and his entities in state court for misappropriation of the commissions. After a bench trial, Tyler and his entities were found liable to TMTA and the Agency for $715,441.65, after a partial offset. The parties do not dispute that Tyler's conduct constitutes "theft" for purposes of the policy or that he was an "employee" under the policy.

---

[3] Under Michigan law, "An insurer or insurance producer shall not pay a commission, service fee, or other valuable consideration to a person for selling, soliciting, or negotiating insurance in this state if that person is required to be licensed under this chapter and is not so licensed." Mich. Comp. Laws § 500.1240. TMTA could not receive insurance commissions directly from insurance companies as it was not a "licensed producer." Therefore, commissions had to be paid to the Agency, a licensed producer.

[4] In the state court action brought by TMTA against Tyler for misappropriation of the commissions, Tyler brought a counterclaim for unjust enrichment seeking payment of unpaid commissions. TMTA argued successfully that a counterclaim would not lie against it because it had no legal authority to collect insurance commissions and was therefore not unjustly enriched. Rather, TMTA argued, *the Agency* was the proper defendant in Tyler's claim. The court agreed and dismissed Tyler's counterclaim against TMTA.

4

4. TMTA's Claim on the Policy

On May 21, 2007, TMTA wrote Hartford stating that it had discovered Tyler's theft and requested that Hartford process a claim for the loss. Hartford responded stating that it was opening a claim file and requested TMTA to submit further information and formal Proof of Loss. TMTA responded, providing all the requested information and a formal Proof of Loss. Over the course of the next year, Hartford continued to request further information in support of the loss.

On December 19, 2007, TMTA submitted an Amended Proof of Loss providing documentation supporting its claim that Tyler had stolen $784,447.39 in commissions and bonuses from TMTA. Hartford has never made a determination of coverage.

5. Procedural History

Because Hartford failed to determine coverage, TMTA brought an action in Oakland County Circuit Court seeking declaratory judgment and damages for breach of contract. Hartford removed on the basis of diversity jurisdiction. TMTA is a Michigan corporation with a principal place of business in Michigan. Hartford is a Connecticut corporation with a principal place of business in Connecticut. The amount in controversy exceeds $75,000. The Court has jurisdiction. *See* 28 U.S.C. § 1332(a).

Shortly after removing, Hartford filed a third-party complaint against Tyler and his wholly-owned entities seeking indemnity. Tyler answered the complaint and has pleaded affirmative defenses.

Hartford filed a motion for summary judgment on TMTA's claims. Although the briefing relates only to the declaratory judgment claim, TMTA concedes that its breach of contract claim is duplicative of the declaratory judgment claim and the claims rise or fall

together. TMTA included a motion for summary judgment in its response brief.[5] Both parties concede the absence of any genuine issue of material fact, and argue that each is entitled to judgment as a matter of law.

**DISCUSSION**

I. Legal Standards

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is the appropriate method for resolving purely legal issues involving no issues of disputed fact that require submission to a fact-finder.

"Under the long-standing *Erie* doctrine, in actions brought in federal court invoking diversity jurisdiction, a court must apply the same substantive law as would have been applied if the action had been brought in a state court of the jurisdiction where the federal

---

[5] TMTA's election to include its cross-motion for summary judgment in its response brief, rather than in a separate motion for summary judgment, was improper. Although a moving party may combine its supporting brief with its motion (so long as the brief begins on a separate page), *see* E.D. Mich. LR 7.1(c)(1), the reverse is not permitted. That is, a party opposing a motion may not contain a cross-motion in a response brief. *See* E.D. Mich. LR-Appendix ECF, R5(e) ("[A] response or reply to a motion must not be combined with a counter-motion. Papers filed in violation of this rule will be stricken."). Rather, a cross-motion must be filed independently of the response brief, though nothing would prohibit using the same brief for the response brief and the brief supporting the cross-motion. Parties are required to know the District's Local Rules before appearing. *See* E.D. Mich. LR 83.20(a)(1) ("A person practicing in this court must know these rules ...."). But even had TMTA properly filed a cross-motion for summary judgment, the Court would deny the motion because, for the reasons stated below, TMTA is not entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

6

court is located." *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 723 (6th Cir. 2007). Since TMTA asserts only state causes of action, the Court applies Michigan substantive law.

II. Analysis

The parties do not dispute that TMTA was a named insured under the Policy and that Tyler stole commissions payable to the Agency, a separate legal entity owned entirely by TMTA. What is disputed, however, is whether the Policy covers this type of loss to TMTA. Hartford claims that *the Agency* is the only entity that suffered a direct loss and that TMTA has only suffered an indirect loss expressly excluded from coverage under the Policy. TMTA argues that it suffered a direct loss covered by the Policy.[6]

"An insurance policy is much the same as any other contract. It is an agreement between the parties in which a court will determine what the agreement was and effectuate the intent of the parties." *Auto-Owners Ins. Co. v. Churchman*, 440 Mich. 560, 566 (1992). A court applies a two-part test to determine what the parties agreed to. *Heniser v. Frankenmuth Mut. Ins.*, 449 Mich. 155, 172 (1995). First, a court must determine if the policy provides coverage to the insured. If it does, the court next determines whether coverage is negated by an exclusion. *Id.* Exclusionary clauses are strictly construed in favor of the insured. *Auto-Owners*, 440 Mich. at 567. Clear and specific exclusions must be given effect. A court may not rewrite the policy according the equities in the case and hold an insurance company liable for a risk it did not assume. *Id.* Ambiguous clauses or phrases are construed in favor of the insured. *Heniser*, 449 Mich. at 160.

---

[6] TMTA also seeks damages based on Hartford's refusal to pay the claim. For reasons discussed below, the Court does not reach this issue.

7

Tyler was the General Manager of the Agency. The insurance commissions he stole were properly payable to the Agency and thus property of the Agency. Therefore, if the Agency were a named insured under the Policy, coverage for this loss would be clear. The Agency, however, was never added as a named insured. TMTA chose to add numerous related entities to the Policy, but, for whatever reason, never chose to add the Agency as a named insured. TMTA now relies on the close relationship between TMTA and the Agency in claiming that *TMTA* suffered a direct (and therefore covered) loss due to the theft. It is the Court's job to determine, as a matter of law, whether the Policy is susceptible of such an interpretation.

The two-part test for determining coverage is merged into one in this case because of the language used in the Policy. Specifically, the Policy's Considerations Clause provides that it will pay for losses "which you sustain *directly* from acts" that include employee theft. In further illumination of what is "direct loss," the Policy specifically excludes from coverage all "Indirect Loss," which includes the insured's "inability to realize income [it] would have realized had there been no loss [due to theft]." Policy V(H)(1). The question, then, is whether TMTA's loss due to Tyler's theft was indirect. If the loss falls into one of the examples of indirect loss provided in the Policy, TMTA's loss is excluded from coverage.

The Court concludes that TMTA's loss due to Tyler's theft was indirect, and thus expressly excluded from coverage. The loss falls squarely within one of the examples provided in the indirect loss exclusion clause: "your inability to realize income that you would have realized had there been no loss [due to theft]". Policy V(H)(1). Because of Tyler's theft, TMTA was unable to receive the income it would have received from the

Agency as pass-through income. The insurance commissions were to be remitted directly to the Agency by the insurance companies and were later realized by TMTA only as income earned only by virtue of its being the sole member and owner of the Agency. As TMTA states in its briefing, "[*The Agency's*] property was the Commissions paid to it by insurance companies who sold products to TMTA members. All of the Agency's income was accounted for by TMTA as part of TMTA's federal and state tax filings. TMTA took all of the Agency's income as pass-through income." Pl. Resp. Br. 12.

To be sure, the relationship between TMTA and the Agency appears to be seamless. The Agency was, in reality, a disregarded entity. TMTA accounted for the Agency's entire profit and loss in TMTA's annual filings, the Agency had no employees, except Tyler, who was hired and paid by TMTA, and it had no property except the commissions received from insurance companies. This *de facto* identity between the Agency and TMTA, however, is not relevant here since the Agency is, by law, a separate legal entity with rights separate and distinct from those of its members. *See Trident-Allied Assocs., LLC v. Cypress Creek Assocs., LLC*, 317 F. Supp. 2d 752, 754 (E.D. Mich. 2004) ("[The] Michigan legislature fashioned the limited liability company to be a legal entity distinct from its members."). TMTA can have no direct interest in any Agency, including the commissions stolen by Tyler. *See* Mich. Comp. Laws § 450.4504(2) ("A member has no interest in specific limited liability company property."). For the Court to treat TMTA and the Agency as the same legal entity would disregard the distinction the law makes between the two, and dishonor TMTA's business decisions to create the Agency as separate legal entity and not add it as an insured to the Policy. Therefore, under the plain reading of the Policy, any loss suffered by TMTA as a result of Tyler's theft was simply its inability to realize

income from the Agency. This type of loss is expressly excluded from coverage as an indirect loss. *See* Policy V(H)(1) ("[I]ndirect loss ... include[s] but [is] not limited to loss resulting from ... your inability to realize income that you would have realized had there been no loss ...").

TMTA attempts to re-frame the issue and asks the Court to focus not on the relationship between TMTA and the Agency, but rather on the relationship between TMTA and Tyler. It argues that Tyler was a TMTA employee and owed fiduciary duties that required him to turn over to TMTA any commissions inadvertently or wrongfully paid to him directly by insurance companies. But for Tyler's theft, TMTA argues, TMTA would have received the commissions directly from Tyler so TMTA's loss is properly considered direct (and not excluded). Though thoughtful and creative, this argument ultimately fails. The commissions were payable only to *the Agency*. So, to the extent any commissions were wrongfully or inadvertently made payable to Tyler or his entities, Tyler had a duty to turn them over to *the Agency*, and not TMTA. In fact, TMTA successfully argued in state court that any insurance commissions were required to be made payable to the Agency and not TMTA. Thus, regardless of whether Tyler would have been permitted by law to assign to TMTA any commissions he himself received, *see* Mich. Comp. Laws § 1240(4), that was not the arrangement TMTA had with Tyler in this instance. The arrangement instead provided that all commissions were to be made payable *to the Agency*, not TMTA or Tyler. It is apparent that the Agency was formed for the sole purpose of collecting insurance commissions and if Tyler was able to collect the commissions and assign them to TMTA, there would have been no reason to form the Agency in the first place. For whatever reason, TMTA decided to create the Agency for the purpose of receiving insurance

commissions brokered to TMTA members rather than to have Tyler assign his commissions to TMTA once received. The Court will respect that decision.

TMTA focuses the Court's attention most specifically on *Philip R. Seaver Title Co., Inc. v. Great Am. Ins. Co.*, No. 08-11004, 2008 WL 4427582 (E.D. Mich. Sept. 30, 2008) (Cleland, J.) in which the court held on summary judgment that the insured was entitled to insurance coverage. The insured in that case was a title insurance company that also offered escrow services to clients in real estate closings. After an employee embezzled escrow funds, the company reimbursed its clients' escrow funds from the company's general account and later made a claim against its insurance policy for reimbursement. The insurance company argued that the insured's transfer of money from its general fund to the escrow accounts took the funds out of the policy's coverage because the funds were only used to "reimburse third parties," a classic type of indirect loss according to the insurance company. The court determined that such a reading was in conflict with the plain and ordinary meaning of a "direct loss." It reasoned, "Plaintiff's employee stole money from one account, which Plaintiff then replaced from another account. When its employee acted dishonestly, Plaintiff's overall funds were directly impacted. Thus, coverage for the transfer of funds follows under the [policy]." *Id.* at *3. TMTA argues that just as in *Seaver*, when Tyler stole the insurance commissions, TMTA's "overall funds" were directly impacted so its loss was direct.

*Seaver* is distinguishable in two significant ways. First, it involved different issues. The issue there was whether a mere transfer of funds from different accounts *within in the same company* converted the loss from a direct one to an indirect one. The court rejected the defendant's argument to that effect and found that the loss was direct. The issue in this

case, by contrast, is whether an insured's working relationship with a non-insured is so close that the Court should treat the two as one. For the reasons already stated, the Court concludes that doing so would contravene the intent of the parties as expressed in the Policy. So even though it is true that TMTA's "overall funds were ... impacted," they were only *indirectly* impacted by Tyler's theft. Second, the exclusions clause in the policy in *Seaver* was not similar to the one in this case. The loss here merely prevented TMTA from later realizing the commissions as income, a type of loss expressly excluded from coverage by the terms of the Policy.

The other cases cited by TMTA for support are also inapposite. *See* Pl. Resp. Br. 15-17. In *Dewitt Bldg. Co. v. Auto-Owners Ins. Co.*, No. 235536, 2003 WL 21362804 (Mich. App. June 12, 2003), the plaintiff sought coverage for damages it incurred as a result of the defendant insurance company's failure to pay the claim at issue. The policy did not contain a clause excluding such loss and the court, in denying the defendant's motion for partial summary disposition, refused to read the policy broadly to include such an exclusion: "An insurer must clearly state policy exclusions. Here, the ... policy does not contain an exclusion for indirect damages resulting from the insurer's failure to pay claims, therefore, it does not exclude those losses." *Id.* at *2 (internal citation omitted). The holding in *DeWitt* does not apply here because the type of loss at issue in that case did not fall squarely into one of the exclusions in the policy. In this case, by contrast, the loss falls squarely within the exclusion for unrealized income.

In *Morris Kirschman & Co., L.L.C. v. Hartford Fire Ins. Co.*, No. 03-1743, 2004 WL 1934848 (E.D. La. Aug. 30, 2004), the plaintiff sought coverage for loss it incurred as a result of giving certain employees merit-based raises when the basis for the raises was

12

predicated on a fraud. The district court denied the insurance company's motion for summary judgment, concluding that this type of loss was not expressly excluded by language in the policy, and in fact was expressly *included* by the policy's terms. *Id.* at *2. *Morris* is distinguishable because the type of loss suffered by the insured in that case was expressly included by the coverage clause and did not fall squarely into one of the exclusions. In this case, the loss falls squarely within exclusion for unrealized income.

In *Peoples Sav. Bank of Grand Haven v. Am. Sur. Co. of New York*, 15 F. Supp. 911 (D.C. Mich. 1936), the plaintiff bank sought coverage for a loss it incurred when it was robbed of unissued travelers checks later cashed in various states. The plaintiff bank had to pay a judgment to the bank that initially issued the travelers checks to the plaintiff. It later made a claim for reimbursement of the amount of the judgment plus attorneys fees and costs, which the insurance company denied. The district court entered judgment in the plaintiff bank's favor after concluding that, based on the banking industry's practice of payment of stolen traveler's checks and the insurance company's familiarity with that practice, coupled with the lack of a "clear and express" exclusion of coverage for the loss at issue, the type of loss was contemplated by the parties when they entered into the insurance policy. *Id.* at 913-14. *Peoples Sav.* is distinguishable because in this case, there exists no analogous applicable industry practice of which Hartford must have been aware. And, more importantly, there exists an express exclusion covering precisely the loss at issue here.

Based on the clear and unambiguous language in the Policy, specifically the exclusion of coverage for TMTA's inability to realize income, TMTA is not entitled to coverage for Tyler's theft of the insurance commissions. If the Court were to determine that

13

TMTA is entitled to coverage for the stolen commissions, the Court would be rewriting the Policy to either include the Agency as a named insured or to excise the express exclusion at paragraph V(H)(1). Based on the language in the Policy, Hartford never agreed to cover this liability and the Court has no power to rewrite the Policy and hold it responsible for risks it did not assume. *See Auto-Owners*, 440 Mich. at 567 ("It is impossible to hold an insurance company liable for a risk it did not assume.")

## CONCLUSION AND ORDER

The Court concludes that TMTA is not entitled to coverage for the loss it incurred by reason of Tyler's theft of insurance commissions. Accordingly, the Court will grant Hartford's motion for summary judgment and enter judgment in its favor. This resolves all issues in the case -- including the third-party complaint -- and the matter is closed.

**WHEREFORE** it is hereby **ORDERED** that Defendant Hartford's motion for summary judgment (docket no. 37) is **GRANTED** and judgment will be entered in its favor.

**SO ORDERED.**

                                                 s/Stephen J. Murphy, III
                                                 STEPHEN J. MURPHY, III
                                                 United States District Judge

Dated: August 30, 2010

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 30, 2010, by electronic and/or ordinary mail.

                                                 Andrea Teets
                                                 Deputy Clerk